Cite as 2019 Ark. App. 416

# ARKANSAS COURT OF APPEALS
DIVISION III
No. CV-18-1037

| | |
|---|---|
| | **Opinion Delivered** September 25, 2019 |
| BRITTANY CUNNINGHAM | APPEAL FROM THE FAULKNER COUNTY CIRCUIT COURT |
| APPELLANT | [NO. 23DR-17-775] |
| V. | HONORABLE H.G. FOSTER, JUDGE |
| BRYAN CUNNINGHAM | AFFIRMED |
| APPELLEE | |

## LARRY D. VAUGHT, Judge

The parties in this case, Brittany Cunningham and Bryan Cunningham, were divorced by an amended decree entered by the Faulkner County Circuit Court on September 13, 2018. Brittany appeals from the decree arguing that the circuit court clearly erred by awarding joint custody. We affirm.

Brittany and Bryan were married on July 7, 2014. They have one child, PC, who was born on July 31, 2015. On August 29, 2017, Brittany filed a complaint for divorce on the basis of general indignities and sought full custody of PC. In Bryan's answer, he requested full custody of PC.

At the divorce hearing, the only issues presented were custody, visitation, and child support. Brittany testified that before she married Bryan, she had been married to Brandon Betz and that they have two boys together. When she and Brandon divorced in March 2014,

they agreed to joint custody, and they equally split the boys' time and expenses. She said the arrangement had been working well.[1]

Brittany testified that after she married Bryan, who also has children from a prior marriage, he made her joint-custody arrangement with Brandon difficult. Brittany testified that Bryan treated her boys differently than he treated his children, and Bryan accused Brittany of staring at Brandon or trying to stand next to him at the boys' sporting events and at custody exchanges. She said that Bryan did not like her to be around Brandon or a man she was "casual[ly] dating" named Jeremy McGaugh.

Brittany also testified that she has been the primary caregiver for PC since her birth. Brittany said that during the marriage, Bryan spent much of his time working and did not spend much time with PC. Brittany said she and Bryan are physical therapists for the same home-health care company; however, Bryan works more than she does. She said that since the parties' separation, Bryan's work schedule has prevented him from exercising his full visitation with PC and that he often calls her to keep PC so he can work.

Brittany stated that she was not opposed to the concept of joint custody in general but not with Bryan. She complained that his communication skills were "awful" and that his failure to communicate caused problems. She said that he would not give her twenty-four-hour notice of his plans to exercise visitation and that he ignored her calls and texts. She also complained that Bryan did not put PC's needs first, he said "hateful" things about Brittany in front of PC, he would not give PC a bath after playing outside, he is not as structured with PC's schedule

---

[1]The parties stipulated to Brandon's testimony—that the joint-custody arrangement he has with Brittany works wonderfully.

as Brittany is, he took PC on a church fishing trip when she was sick, and he brought her to his work. Finally, she complained that because Bryan did not exercise all his visitation with PC during the separation, she did not think he would be able to keep PC for an entire week. She said he is too focused on his work and unable to prioritize PC. She testified that if the parties were given joint custody of PC, they would be back in court on that issue within three or four months.

Bryan testified that he originally opposed the divorce and wanted to save the marriage. He said he and Brittany continued to be romantically involved as late as November 2017.[2] Bryan stated that during that same time, Brittany was also romantically involved with Jeremy, which upset Bryan because he wanted to be with Brittany and because he did not want Jeremy around PC. However, at the divorce hearing, Bryan testified that his primary concern was the safety and well-being of PC.

Bryan admitted that he works a lot. He said that he was required to give Brittany the right of first refusal to babysit PC, and problems arose when he tried to get PC back. Brittany would not let him pick up PC when he was finished working. He had to wait to pick up PC when Brittany said he could. Sometimes Brittany would make him wait until the next day. Bryan testified that he is a licensed nurse and knows how to care for PC.

Jeremy testified that he and Brittany started spending time together in May 2017 and are romantically involved. Jeremy said that he and Bryan have had some heated phone calls, which Jeremy said he understood because Bryan was still married to Brittany. Jeremy was also questioned about an affidavit signed by his ex-wife that was filed in support of an order of

_____

[2]Brittany admitted that she had been intimate with Bryan at the end of September 2017.

protection she sought. He admitted that he had problems with drugs and alcohol in the past, and he said he last used methamphetamine in April 2016. He denied cooking meth in his home as alleged in the affidavit; however, he admitted ripping the cabinets off the wall and punching a hole in the wall. He also admitted being arrested in July 2016 for possession of a methamphetamine pipe and a pistol.

From the bench, the circuit court found that neither Brittany nor Bryan were perfect: Bryan had not been reliable in terms of responding to texts, and Brittany had made questionable choices. However, the court further found that neither parent was fatally flawed, that both parents love PC, and that both parents want what is best for PC. The court found that the best thing for PC was to maximize her time with both parents; therefore, the court awarded joint custody with Brittany and Bryan splitting equal time with PC. The court found that if there are issues with medical decisions or other issues of similar magnitude, Brittany would have the final decision-making authority. The court did not award child support to either party. After the court entered an amended decree reiterating its findings, this appeal followed.

We perform a de novo review of child-custody matters, but we will not reverse the circuit court's findings unless they are clearly erroneous. *Grimsley v. Drewyor*, 2019 Ark. App. 218, at 8, 575 S.W.3d 636, 641. A finding is clearly erroneous when, although there is evidence to support it, the reviewing court is left with the definite and firm conviction that a mistake has been made. *Id.*, 575 S.W.3d at 641. Finally, we recognize and give special deference to the superior position of the circuit court to evaluate the witnesses, their testimony, and the child's best interest. *Id.*, 575 S.W.3d at 641.

The primary consideration in child-custody cases is the welfare and best interest of the children; all other considerations are secondary. *Id.*, 575 S.W.3d at 641. Our legislature has determined that an award of joint custody is favored in divorce cases. Ark. Code Ann. § 9-13-101(a)(1)(A)(iii) (Repl. 2015). When in the child's best interest, custody should be awarded in such a way as to ensure the frequent and continuing contact of the child with both parents. *Grimsley*, 2019 Ark. App. 218, at 8, 575 S.W.3d at 641.

Brittany first argues that the circuit court clearly erred in awarding joint custody to the parties because the award is inconsistent with its grant of divorce based on general-indignities grounds. Specifically, she argues that the divorce was granted because Bryan would not work with her to blend their families and because he interfered with her and Brandon's joint-custody arrangement; therefore, she and Bryan could not work together in a joint-custody arrangement.

We reject Brittany's interpretation of the evidence supporting the circuit court's general-indignities finding. The evidence supports the conclusion that during the marriage Bryan was jealous of, and upset about, Brittany's ex-husband, and as a result, Bryan made things difficult for her in that relationship. This evidence supports grounds based on the relationship between Brittany and Bryan, as required under Arkansas Code Annotated section 9-12-301(b)(3)(C) (Repl. 2015).[3] In contrast, the primary consideration in child-custody cases is the welfare and best interest of the children; all other considerations are secondary. *Grimsley*, 2019 Ark. App. 218, at 8, 575 S.W.3d at 641. Because different considerations are required to

---

[3]The circuit court shall have power to dissolve and set aside a marriage contract when either party shall offer such indignities to the person of the other as shall render his or her condition intolerable. Ark. Code Ann. § 9-12-301(b)(3)(C) (Repl. 2015).

make general-indignities and joint-custody findings, we reject Brittany's argument that we must reverse the joint-custody award because the circuit court found the grounds of general indignities supported the divorce action.

Brittany next argues that the circuit court erred in awarding joint custody because the evidence shows that she has always been PC's primary caregiver and because Bryan did not exercise all his visitation with PC during the parties' separation. The fact that one parent is the primary caretaker of the child during the marriage is not in and of itself determinative, although relevant and worthy of consideration. *Black v. Black*, 2015 Ark. App. 153, at 9, 456 S.W.3d 773, 778.

Brittany also argues that the joint-custody award is reversible error because she and Bryan are unable to cooperate and communicate effectively. Our court held in *Stibich v. Stibich*, 2016 Ark. App. 251, at 5, 491 S.W.3d 475, 479 (citations omitted), that regardless of whether joint custody is favored, our law remains that "the mutual ability of the parties to cooperate in reaching shared decisions in matters affecting the child's welfare is a crucial factor bearing on the propriety of an award of joint custody, and such an award is reversible error where cooperation between the parents is lacking."

In *Stibich*, our court reversed and remanded the circuit court's joint-custody award because the parties did not possess the willingness and ability to cooperate in reaching shared decisions regarding their children. *Id.* at 6, 491 S.W.3d at 479. There, the parties were involved in lengthy, contentious litigation concerning custody, which led to an opinion letter in which the circuit court found that the parties were unable to agree on anything, that the parties fought about even the most insignificant matters, and that the court was not confident that the parties

would set aside their differences and work together for the best interest of the children. *Id.*, 491 S.W.3d at 476; *see also Hewett v. Hewett*, 2018 Ark. App. 235, at 6, 547 S.W.3d 138, 141 (reversing and remanding the joint-custody award; holding that if the parties' inability to get along and their overt hostility toward each other amounted to a material change in circumstances, awarding joint custody was in direct violation of our case law that holds joint custody is inappropriate when cooperation between the parties is lacking); *Li v. Ding*, 2017 Ark. App. 244, at 12, 519 S.W.3d 738, 744 (reversing and remanding the joint-custody award because the circuit court (1) found the parties had "significant disagreement" regarding school choice and parenting skills, had "poor" communication, and were "very rigid" in their thinking and (2) ordered the parties to take four one-day parenting classes to "hopefully" help their communication with one another, which the circuit court described as "completely failing").

Brittany's reliance on *Stibich*, *Hewett*, and *Li* is misplaced. In those three cases, the parties' significant hostility and inability to communicate was clearly established by the evidence, expressly stated in the circuit court's findings, and far exceeded that in the instant case. Instead, we rely on two cases in which we affirmed the circuit court's joint-custody award despite evidence that the parties were not getting along or not communicating well.

In *Hoover v. Hoover*, the appellant argued that the joint-custody award was improper because the parties lacked the ability to cooperate in reaching shared decisions in matters affecting the children. 2016 Ark. App. 322, at 7–8, 498 S.W.3d 297, 301. In affirming the joint-custody award, we acknowledged the significant level of animosity between the parties but noted that the record demonstrated both parties were capable parents, loved the children, and were equally involved in their activities. *Id.*, 498 S.W.3d at 302. We also noted with approval

7

the circuit court's finding that joint custody, along with the elimination of the right-of-first-refusal-babysitting agreement, which had caused "nothing but problems" and had "possibly led to more turmoil than anything in the divorce decree," would reduce interactions between the parties. *Id.* at 8, 498 S.W.3d at 302.

Similarly, in *Grimsley*, we affirmed a joint-custody award despite the appellant's argument on appeal that the parties had parted in hostility with no trust between them. 2019 Ark. App. 218, at 10–11, 575 S.W.3d at 641–42. There, we stated that "[m]ost joint-custody situations involve some amount of disagreement" and held that there was evidence that the parties had raised the children as a team and that both parents were very involved with the children. *Id.* at 10, 575 S.W.3d at 642. We refused to reweigh the evidence differently than the circuit court regarding the appropriateness of joint custody and the credibility of the witnesses. *Id.*, 575 S.W.3d at 642.

Each child-custody determination ultimately must rest on its own facts. *Hoover*, 2016 Ark. App. 322, at 9, 498 S.W.3d at 302. On this record, it is clear that the circuit court carefully considered all the evidence presented. The circuit court acknowledged some conflict between Brittany and Bryan. But as we noted in *Grimsley*, "[m]ost joint-custody situations involve some amount of disagreement." 2019 Ark. App. 218, at 10, 575 S.W.3d at 642. Significantly, the conflict between Brittany and Bryan is substantially less than that in *Stibich*, *Li*, and *Hewett*.

The circuit court also found that both parents love PC and want what is best for her. The court found that joint custody was in PC's best interest because it would maximize her time with both parents and reduce the number of custody exchanges, which was the source of a significant amount of the conflict between the parties.

8

We refuse to reweigh the evidence differently than the circuit court regarding the appropriateness of joint custody and the credibility of the witnesses. *Grimsley*, 2019 Ark. App. 218, at 10, 575 S.W.3d at 642. Recognizing the superior position of the circuit court to evaluate the witnesses, their testimony, and the children's best interest, we are not left with a definite and firm conviction that the circuit court made a mistake in awarding joint custody. We affirm.

Affirmed.

VIRDEN and SWITZER, JJ., agree.

*Helen Rice Grinder*, for appellant.

*McKinney & McKinney, PLLC*, by: *Jared C. McKinney*, for appellee.